Scott E. Davis
State Bar No. 016160
SCOTT E. DAVIS, P.C.
8360 E. Raintree Drive, Suite 140
Scottsdale, AZ 85260

Telephone: (602) 482-4300
Facsimile: (602) 569-9720
email: davis@scottdavispc.com

*Attorney for Plaintiff Melissa Meyers*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| Melissa Meyers,<br><br>Plaintiff,<br><br>v.<br><br>Liberty Life Assurance Company of Boston,<br><br>Defendant. | Case No.<br><br>**COMPLAINT**<br><br>Count I: ERISA claim for long-term disability benefits<br><br>Count II: ERISA claim for equitable relief |

Now comes the Plaintiff Melissa Meyers (hereinafter referred to as “Plaintiff”), by and through her attorney, Scott E. Davis, and complaining against the Defendant, she states:

***Jurisdiction***

1. Jurisdiction of the court is based upon the Employee Retirement Income Security Act of 1974 (ERISA); and in particular, 29 U.S.C. §§ 1132(e)(1) and 1132(f). Those provisions give the district courts jurisdiction to hear civil actions brought to recover employee benefits. In addition, this action may be brought before this Court pursuant to 28 U.S.C. § 1331, which gives the Court jurisdiction over actions that arise under the laws of the United States.

***Parties***

2. At all times relevant to this action, Plaintiff was a resident of Maricopa County, Arizona.

3. Upon information and belief, Wells Fargo & Company (hereinafter referred to as the "Company") sponsored, administered and purchased a group long-term disability insurance Policy (hereinafter referred to as the "Policy") which was issued and fully insured by Liberty Life Assurance Company of Boston (hereinafter referred to as "Liberty Mutual").

4. The specific Liberty Mutual group long-term disability insurance Policy is known as Group Policy No. GF3-850-289-424-01 (the Policy is attached hereto as Exhibit "A").

5. The Company's purpose in purchasing the Policy was to provide disability insurance and income protection for its employees.

6. Upon information and belief, the Policy may have been included in and part of an employee benefit plan, specifically named the Wells Fargo & Company Long Term Disability Plan (hereinafter referred to as the "Plan") which may have been created to provide the Company's employees with welfare benefits.

7. At all times relevant hereto, the Plan constituted an ERISA "employee welfare benefit plan" as defined by 29 U.S.C. § 1002(1).

8. Upon information and belief, Liberty Mutual functioned as the claim administrator of the Plan and Policy.

9. Pursuant to the relevant ERISA regulation, the Company, and/or the Plan may not have made a proper delegation or properly vested fiduciary authority or power for claim administration in Liberty Mutual.

10. Liberty Mutual operated under a structural financial conflict of interest because it fully insured the Policy and made every decision regarding whether Plaintiff was disabled in her long-term disability claim.

11. In administering Plaintiff's claim, Liberty Mutual operated under dual and conflicting roles as the decision maker with regard to whether Plaintiff was disabled, and also the payor of benefits if it found she was disabled.

12. Liberty Mutual's structural financial conflict of interest existed and manifested because if it found Plaintiff was disabled, it was then financially liable to pay her long-term disability benefits.

13. The Company, Liberty Mutual and the Plan conduct business within Maricopa County and all events giving rise to this Complaint occurred within Arizona.

***Venue***

14. Venue is proper in this district pursuant to 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391.

***General Allegations of Common Claims***

15. Incident to her employment, Plaintiff was a covered employee pursuant to the Plan and the relevant Policy, and a "participant" as defined by 29 U.S.C. § 1002(7).

16. Plaintiff seeks disability income benefits in the form of "Own Occupation" benefits from the Plan and the relevant Policy pursuant to § 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B), as well as any other non-disability employee benefits she may be entitled to from the Plan, from any other Company Plan, and/or from the Company itself as a result of being found disabled in this action.

17. After working for the Company for ***over eight (8) years*** as a loyal employee in the occupation as a Loan Administration I, on or about July 25, 2017, Plaintiff became disabled from working in that occupation, and also disabled from working in any occupation for a period of time due to her disabling medical conditions.

18. As referenced *infra*, on November 2, 2018, Plaintiff returned to work for the Company in the occupation as a Resolution Team Specialist. Plaintiff returned to work in this occupation because her disabling medical conditions allowed her to make a trial work attempt to see if she could perform it.

19. The material job duties of a Resolution Team Specialist are significantly easier to perform when compared to her prior occupation when she became disabled - a Loan Administration I.

20. One reason Plaintiff's new occupation as a Resolution Team Specialist is easier to perform is due to the fact that it does require her to manage any Company employees.

21. Thus, Plaintiff seeks long-term disability benefits for the entire "Own Occupation" timeframe (i.e. 24 months of benefits), because due to her disabling medical conditions she has not been able to return to her prior occupation as Loan Administration I since she became disabled on July 25, 2017.

22. Following the onset of her disability on July 25, 2017, Plaintiff filed a claim for short-term disability benefits.

23. Plaintiff's short-term disability claim was made to the Company's Short-Term Disability Plan which the Company self-insured, funded and paid any and all benefits that were due to the beneficiaries.

24. The Company retained Liberty Mutual to administer and make all claims decisions in the claim that were made to the Short-Term Disability Plan.

25. After administering and reviewing the evidence in Plaintiff's short-term disability claim, Liberty Mutual concluded she met the Plan's "own occupation" definition of disability for the *entire short-term disability timeframe* and the maximum duration disability benefits were available and could be paid to her in that claim.

26. The Company's self-insured Short-Term Disability Plan contained a definition of disability that Plaintiff had to meet in order to be found disabled and entitled to benefits which is defined as follows:

> "For purposes of the STD Plan, a medically certified health condition is generally defined as a disabling injury or illness that:
>
> - Is documented by clinical evidence as provided and certified by an approved care provider. Clinical evidence may include medical records, medical test results, physical therapy notes, mental health records, and prescription records.
>
> - ***<u>Prevents you from performing the essential functions of your own job</u>*** as regularly scheduled for longer than the STD waiting period." (emphasis added)(emphasis added).

27. A comparison of the definition of disability in the Short-Term Disability Plan, as referenced in paragraph 26, confirms that it is essentially identical to the "Own Occupation" definition of disability in the long-term disability Policy, as referenced in paragraph 38.

28. As referenced, the Short-Term Disability Plan was self-insured by the Company, and it was liable for and paid all short-term disability benefits if Liberty Mutual found Plaintiff was disabled as set forth in the Plan.

29. After reviewing Plaintiff's short-term disability claim, when Liberty Mutual had *no financial liability* for the decision it made in the claim, it found Plaintiff met the definition of disability set forth in the Company's Short-Term Disability Plan *throughout the entire* short-term disability timeframe.

30. Plaintiff's short-term disability benefits have all been paid by the Company and those benefits have all been exhausted.

31. Following the exhaustion of her short-term disability claim/benefits, Plaintiff then filed a claim for long-term disability benefits under the relevant Policy with Liberty Mutual.

32. Plaintiff asserts the fact that her short-term disability claim was approved in its entirety by Liberty Mutual (with Liberty Mutual using a similar, if not identical, definition of disability in the Wells Fargo & Company Short Term Disability Plan as is also set forth the Liberty Mutual's fully insured long-term disability Policy for the first twenty-four (24) months), and the fact that significantly more evidence (medical and otherwise) of Plaintiff's disability was submitted in her long-term disability claim, is relevant evidence for the Court to consider with regard to the influence and detrimental affect Liberty Mutual's structural conflict of interest had in its denial of her long-term disability claim as well as evidence of the unlawfulness and unreasonableness of Liberty Mutual's inconsistent long-term disability claim denial.

33. Liberty Mutual's decision to deny Plaintiff's long-term disability claim after finding she was not disabled on the ***183rd day*** of her disability, when it had *already previously concluded* she was unable to work in her occupation for the prior ***182 consecutive days*** in her short-term disability claim is a breach of its ERISA fiduciary duty to Plaintiff because the denial is illogical, implausible, unreasonable and unlawful.

34. Liberty Mutual's denial of Plaintiff's long-term disability claim was also illogical, implausible and unreasonable because on the 183rd day of her disability, her disabling medical conditions or functionality had not improved or changed from the *prior day*, when Liberty Mutual had consistently determined Plaintiff was *unable* to work in her occupation as a Loan Administration I due to her disabling medical conditions and/or functionality.

35. Plaintiff alleges Liberty Mutual's approval of the entirety of her short-term disability claim when it had no financial liability to her is evidence that Liberty Mutual's denial of Plaintiff's long-term disability claim was influenced by and the ***direct result*** of its structural financial conflict of interest referenced *supra*, and desire to save money by denying her long-term disability claim.

36. In Plaintiff's long-term disability claim, Liberty Mutual made every decision regarding whether she was disabled pursuant to the terms of the relevant Liberty Mutual long-term disability Policy.

37. Upon information and belief, the relevant Liberty Mutual long-term disability Policy's definition of disability governing Plaintiff's claim is as follows:

"Disability or Disabled means:

i. that during the Elimination Period and the next 24 months of Disability the Covered Person, as a result of Injury or Sickness, is ***unable to perform the Material and Substantial Duties of his Own Occupation*** (emphasis added); and (Compare to the Short Term Disability Plan's definition of disability in ¶ 26).

ii. thereafter, the Covered Person is unable to perform, with reasonable continuity, the Material and Substantial Duties of Any Occupation."

38. In support of her claim for long-term disability benefits, Plaintiff submitted to Liberty Mutual, medical and other evidence supporting her allegation she met the "Own Occupation" definition of disability defined in the relevant Policy.

39. As part of its review of Plaintiff's claim for long-term disability benefits, Liberty Mutual obtained medical records only "paper reviews" (meaning Liberty Mutual's medical consultants ***never*** personally to or physically examined Plaintiff as part of their review or report) from two (2) medical professionals of its choosing, named David Hoenig, M.D. and Himani Janapana, M.D.

40. David Hoenig, M.D. and Himani Janapana, M.D. are both consulting medical professionals for MLS Group of Companies, LLC. (hereinafter referred to as "MLS").

41. According to the information on MLS' website, "[MLS'] IME and Peer Review Disability Reviews focus on function and an employee's ability to return to work." (*See* Exhibit "B" for information from MLS' website).

42. MLS' information from its website confirms it does not provide services for plaintiffs or disability claimants/insureds in their disability or other claims.

43. MLS was biased, conflicted and not an independent or impartial company in its participation in Plaintiff's claim due to its long, extensive business relationship and history of providing biased medical records reviews which favor disability insurance companies such as Liberty Mutual and disfavor Liberty Mutual's claimants such as occurred in Plaintiff's claim.

44. MLS's bias and conflict of interest was clearly exposed in *Hertz v. Hartford Life & Accident Ins. Co.*, 991 F. Supp 2d 1121, 1136 (D. Nev. 2014), where the Court reversed the denial of an ERISA disability claim by a conflicted insurance company after allowing discovery into various conflicts of interest and bias relating to the disability insurance company ***and*** its third party vendor MLS, who retained the reviewing medical doctor (*See* Exhibit "C" for *Hertz* decision).

45. MLS's discovery answers in *Hertz* document that ***95%*** of the time in ERISA disability claims, MLS and its retained, reviewing doctors opined that a claimant was able to work and was not disabled, the Court referenced this troubling fact in its decision:

> ***"Accordingly, MLS found that approximately 95% of all claimants could perform some type of work.***
>
> During that same time frame, Dr. Rim reviewed fourteen (14) claims for Hartford…Significantly, of those fourteen (14) claims reviewed, Dr. Rim did not find that a single claimant was completely unable to perform any type of work.
>
> ***Accordingly, Dr. Rim found that 100% of all claimants could perform some type of work.***
>
> The Court finds these statistics strongly suggest that both MLS and Dr. Rim harbored a significant bias towards finding a claimant capable of performing some type of work. *See Montour*, 588 F.3d at 634 (noting relevance of statistics regarding Hartford's rate of claims denials or how frequently it contracts with the file reviewers it employed in that case to the issue of bias)"(emphasis added)(*See* Exhibit "C" for discovery answers in *Hertz*).

46. Due to its long business relationship with the disability insurance industry and Liberty Mutual, the discovery answers in *Hertz* proves MLS has no incentive to implement a system or process allowing it to regularly and consistently monitor the independence and impartiality of the medical professionals it retains to perform medical record reviews such as the type of review it provided to Liberty Mutual in Plaintiff's claim.

47. Plaintiff alleges Drs. Hoenig and Janapana were not "independent" medical reviewers as alleged by Liberty Mutual, Drs. Hoenig and Janapana, but are instead biased, long-time medical consultants who are repeatedly retained by Liberty Mutual, MLS and by many other disability insurance companies in the industry.

48. Attached hereto as Exhibit "D" is a letter authored by Dr. Hoenig posing questions to another one of undersigned counsel's disability client's treating provider following his review of her disability claim for another third-party vendor, Dane Street, who was retained by another disability insurance company, Mutual of Omaha.

49. The fact that Dr. Hoenig is ***<u>currently reviewing</u>*** medical records in another one of undersigned counsel's disability client's claim, documents the fact that he is repeatedly retained to provide medical records reviews by many different third-party vendors and works for many disability insurance companies and labors under his own conflict of interest.

50. Due to their long-time relationship with Liberty Mutual, MLS and/or the disability insurance industry, Drs. Hoenig and Janapana are biased and operated under their own conflicts of interests. These doctors' conflicts of interest and bias led to their selective review of Plaintiff's evidence, their deliberate and blatant de-emphasizing of Plaintiff's evidence which proved she was disabled and is the reason they ultimately rendered an opinion that Plaintiff was not disabled.

51. Liberty Mutual's structural financial conflict of interest led to it accepting and basing the denial of Plaintiff's claim on the biased, one sided reports authored by Drs. Hoenig and Janapana

52. Due to their conflicts of interest, Drs. Hoenig and Janapana have incentives to protect their own consulting relationships with Liberty Mutual, MLS and/or the disability insurance industry by providing medical records only "paper reviews," where they selectively review, ignore, and de-emphasize evidence which proves that Plaintiff is disabled and entitled to benefits, in order to provide opinions and report(s) favoring Liberty Mutual, which unreasonably and implausibly led to and allowed Liberty Mutual to unlawfully deny Plaintiff's long-term disability claim.

53. In a letter dated March 27, 2018, Liberty Mutual informed Plaintiff it was denying her claim for long-term disability benefits after concluding, "Based on the medical documentation and assessment conducted in relation to the requirements of your own occupation, you do not meet the definition of disability outlined above."

54. Pursuant to 29 U.S.C. § 1133, Plaintiff timely appealed Liberty Mutual's March 27, 2017 denial of her long-term disability claim.

55. In support of her claim and appeal, Plaintiff submitted to Liberty Mutual additional reliable, credible and compelling medical, vocational and lay-witness evidence supporting her allegation she was disabled and met the "Own Occupation" definition of disability in the long-term disability Policy.

56. In support of her claim, Plaintiff submitted to Liberty Mutual a November 5, 2018 narrative letter authored by her board certified treating physician who concluded, "I do believe [Plaintiff] is totally disabled and unable to work in her job at Wells Fargo and any job, and has been since July 2017, due to multiple medical conditions…"

57. Plaintiff also submitted a June 28, 2018 neurological Independent Medical Examination report authored by a board certified neurologist who after personally

examining Plaintiff and reviewing her relevant medical records and other evidence concluded, "There is no evidence that [Plaintiff's] medical conditions have improved in any way since she last worked in July of 2017…Certainly based on her presentation today, she would not be capable of returning to work.."

58. Further supporting her claim, Plaintiff submitted a Vocational Assessment (evaluation) dated October 1, 2018 from a certified vocational expert, who after personally interviewing Plaintiff to understand the material duties of her occupation and reviewing relevant evidence in Plaintiff's claim regarding her functional limitations, along with the "Own Occupation" definition of disability set forth in the long-term disability Policy concluded, "…it is my professional opinion to a reasonable degree of vocational probability that [Plaintiff] is totally disabled from working in her occupation as it is performed for her employer, other employers of Loan Administration managers, and how the DOT describes how the job is performed."

59. In a letter dated November 13, 2018, Plaintiff informed Liberty Mutual that she had "…[returned] to work on November 2, 2018; however, she remained unable to work in her prior occupation…"

60. As referenced *supra*, on November 2, 2018, due to limited improvement in her medical condition which was not sufficient to return to work in her prior occupation with the Company as a Loan Administrator I, Plaintiff intentionally returned to work for the Company in a different occupation as a Resolution Team Specialist.

61. The material duties of Plaintiff's new occupation as a Resolution Team Specialist are not as skilled, not as cognitively or physically demanding, and are significantly easier to perform as compared to Plaintiff's prior occupation as a Loan Administrator I. An example is a Resolution Team Specialist does not *manage* other employees.

62. When Plaintiff returned to work on November 2, 2018, due to her disabling medical conditions she continued to be *unable to perform the material duties* of her prior occupation as a Loan Administrator I.

63. Through the date of filing this Complaint, Plaintiff has remained disabled and unable to perform the "material duties" of her prior occupation as a Loan Administrator I.

64. Therefore, through the date of filing this Complaint, due to her disabling medical conditions, Plaintiff continues to meet the long-term disability Policy's definition of disability for "Own Occupation" benefits and she remains entitled to those benefits.

65. Due to her disabling medical conditions and inability to perform the material duties of her prior occupation as a Loan Administrator I, Plaintiff continues to meet the long-term disability Policy's definition of disability for "Own Occupation" benefits and is therefore, currently entitled to long-term disability benefits and she will be entitled to those benefits for the maximum timeframe they are payable pursuant to the Policy.

66. In a Vocational Assessment Addendum dated November 20, 2018, the same certified vocational expert who authored the October 1, 2018 Vocational Assessment confirmed, "In order to try and minimize the triggers of her medical conditions brought on by her former job…[Plaintiff] has returned to work with her former employer *in a non-supervisory/non-management position* on November 2, 2018." (emphasis added).

67. During her appeal, Plaintiff also submitted updated medical records from each of her treating medical professionals, along with a list of her current medications, the side effects they cause and the significant negative affect those medications have on her ability to work in her prior occupation as a Loan Administrator I.

68. Plaintiff also submitted to Liberty Mutual two (2) sworn affidavits authored by herself and her husband, both confirmed Plaintiff is unable to work in her prior occupation and that her disabling medical conditions had not improved in any meaningful

way since the date she originally became disabled that would allow her to return to her prior occupation as a Loan Administrator I.

69. All of the credible, reliable and compelling evidence Plaintiff submitted to Liberty Mutual consistently proved she is unable to work in her prior occupation as a Loan Administrator I, and that she met and continues to meet the "Own Occupation" definition of disability set forth in the long-term disability Policy.

70. On appeal, as part of its review of Plaintiff's claim for long-term disability benefits, Liberty Mutual again obtained medical records only "paper reviews" from two (2) additional medical professionals of its choosing, who are named Mostafa Farache, M.D. and Gary Nudell, M.D.

71. Dr. Farache and Dr. Nudell ***never*** talked to Plaintiff or physically examined her as part of their review of her long-term disability claim.

72. Both Drs. Farache and Nudell are consulting medical reviewers for a third-party vendor known as MES Solutions.

73. According to MES Solutions' information on its website, "PRS [Peer Review Services] is a division of MES that provides evidence or standards-based independent medical peer review[s] for national insurance carriers, self-insured entities, third-party administrators, and governmental agencies across the country." (*See* Exhibit "E" for information from MES Solutions' website).

74. MES Solutions' information from its website confirms it does not provide services for plaintiffs or disability claimants/insureds in their disability or other claims.

75. MES Solutions is biased, conflicted and not an independent or impartial company. Similar to MLS and the allegations made by Plaintiff against MLS *supra*, MES Solutions also has a long, extensive business relationship and history of providing biased medical records reviews which favor disability insurance companies such as Liberty Mutual, and which do not favor claimants such as the Plaintiff.

76. District courts in ERISA disability cases have reversed the denial of benefits made by an insurance company after it unreasonably relied on an MES Solutions doctor's selective and biased review. *See Garrison v. Aetna Life Ins. Co.*, 558 F. Supp. 2d 995, 1002 (C.D. Cal. 2008)(Aetna abused discretion terminating benefits after relying on a record review from an MES doctor(s)); *also Maher v. Aetna Life Ins. Co.*, 186 F. Supp. 3d 1117 (W.D. Wash. 2016) and *Mason v. Fed Express Corp.*, 165 F. Supp. 3d 832 (D. Alaska 2016).

77. Due to its long business relationship with the disability insurance industry, similar to MLS, MES Solutions has no incentive to and in fact, has not implemented any system or process allowing it to regularly and consistently monitor the independence and impartiality of the medical professionals it retains to perform medical records reviews and/or to examine claimants/insureds in ERISA disability claims.

78. Plaintiff alleges Drs. Farache and Nudell labor under their own conflicts of interests as they are long-time medical consultants for Liberty Mutual, MES Solutions, and the disability insurance industry.

79. Due to their long-time relationships with Liberty Mutual, MES Solutions and/or the disability insurance industry, Drs. Farache and Nudell are biased and have conflicts of interest and incentives to protect their own consulting relationships with Liberty Mutual, MES Solutions and/or the disability insurance industry by providing in Plaintiff's claim, medical records only "paper reviews" which selectively reviewed, ignored and de-emphasized her evidence that proved she was disabled. Drs. Farache and Nudell unlawfully rendered their biased and one-sided opinions favoring Liberty Mutual so it had a basis to deny Plaintiff's claim.

80. All the doctors retained by Liberty Mutual and/or MLS and/or MES Solutions in Plaintiff's claim to review only her medical records are biased and operate under their own conflicts of interest because they are frequently retained by Liberty Mutual and the

disability insurance industry to perform medical records reviews such as occurred in Plaintiff's claim.

81. Every doctor who reviewed Plaintiff's long-term disability claim had an incentive, financial and/or otherwise, to protect their own consulting, business relationships with Liberty Mutual and/or the third-party vendor who retained them.

82. In their reviews and reports, the aforementioned doctors who were retained to review Plaintiff's long-term disability ***frequently*** opine that a claimant, such as the Plaintiff, is able to work because their disabling medical conditions cause few, if any, work related restrictions and/or limitations.

83. Liberty Mutual unlawfully used the biased, unfair, one sided reports and opinions set forth by the aforementioned doctors and third-party vendors (MLS and MES Solutions) who were involved in Plaintiff's claim to conclude she did not have work related restrictions and/or limitations which would preclude her from working in her prior occupation as Loan Administrator I, or in any occupation.

84. A superficial Lexis search identifies a small sampling of the following ERISA disability claims where Dr. Nudell has provided a medical records review for an insurance company and opined the claimant was not disabled. The cases document Dr. Nudell's extensive business relationship with the disability industry dating back ***to at least 2009***:

- In *Santos v. Quebecor World Long Term Disability Plan*, 254 F.R.D. 643 (E.D. Cal. 2009), the court allowed discovery into Dr. Nudell's bias:

  ***"Accordingly, since Drs. Burns, Clark, and Nudell are associated with RRS or MES, reconsideration of Ruling Six is appropriate. Santos may inquire of Hartford whether it perceived or was actually aware of any tendency by Dr. Burns, Dr. Clark, Dr. Nudell, RRS, and/or MES to routinely or disproportionately make a finding of "no disability" (or the like)."*** (emphasis and underline added).

- In *Lopez v. Standard Ins. Co.*, 2017 U.S. Dist. LEXIS 18155 (M.D. Fla. 2017), the court noted Dr. Nudell opined:

***"…<u>Dr. Nudell</u>, based on his review of the entire medical record, including records up to and including 2014 and determined that the <u>plaintiff could perform sedentary work</u>."*** (emphasis and underline added).

- In *Muccino v. Long Term Disability Income Plan*, 2013 U.S. Dist. LEXIS 55377 (D.N.J. 2013) the court noted Dr. Nudell found no diagnoses existed in concluding the claimant could work:

  ***"<u>Nudell disagreed</u> with Storch's diagnoses of lupus or Sjogren's syndrome and found that Plaintiff <u>did not suffer from any physical health issues which would wholly prevent her from returning to work.</u> Plaintiff's appeal was denied on May 4, 2010, based upon <u>Nudell</u> and Gitlow's reviews."*** (emphasis and underline added).

- In *Topalian v. Hartford Life Ins. Co.*, 945 F. Supp. 2d 294 (E.D.N.Y. 2013), Dr. Nudell again concluded the claimant was able to work:

  ***"<u>Dr. Nudell</u> saw no 'recent evidence that this condition would prevent the claimant from functioning in a sedentary position.'"*** (emphasis and underline added).

- In *Foss v. Qwest Emple. Benefits Comm.*, 2010 U.S. Dist. LEXIS 152437, at *26 (N.D. Ga. 2010), Dr. Nudell again concluded the claimant could work:

  ***"In February 16, 2009, <u>Gary Nudell, M.D.</u>, a board-certified internal medicine specialist, conducted a review and <u>concluded that Plaintiff was not disabled</u>."*** (emphasis and underline added).

- In *Kelley v. Hartford*, 2011 U.S. Dist. LEXIS 154299, at *19-20 (E.D. Tenn. 2011), Dr. Nudell again concluded the claimant could work after rejecting the claimant's subjective complaints:

  ***"<u>Dr. Nudell opined</u> that from an internal medicine perspective, <u>the medical records did not support any functional limitations</u>. Dr. Nudell noted that Plaintiff's <u>subjective complaints were not supported</u> with clinical data and that all of her various diagnoses were somewhat speculative or presumptive because they were <u>not supported by objective tests</u>. <u>Dr. Nudell</u> noted the video surveillance of Plaintiff showed that she had the ability to ambulate without assistance, drive, shop and push a cart, and bend in and out of a car."*** (emphasis and underline added).

85. Importantly, Drs. Hoenig, Janapana, Farache and Nudell are the *only physicians* in Plaintiff's claim who have *never personally examined* or even spoke with Plaintiff personally about her disabling medical conditions so they could understand the

many reason(s)(i.e. subjective symptoms/complaints) for why she is disabled and unable to work in her occupation as a Loan Administrator I.

86. Liberty Mutual's denial of Plaintiff's claim based on Drs. Farache and Nudell's medical records only "paper reviews," and the fact that Liberty Mutual based its decision to deny Plaintiff's claim on those doctor's biased reviews and opinions is an ERISA procedural violation because in accepting their opinions, Liberty Mutual's review was not "full and fair" as the regulation requires.

87. In *Black and Decker Disability Plan v. Nord*, 538 U.S. 822, 832 (2003), the Supreme Court warned about biased, conflicted insurance company retained doctors such as Drs. Hoenig, Janapana, Farache and Nudell, who are repeatedly retained by disability insurance companies and/or third-party vendors such as MLS and MES Solutions to review disability claims by noting, "Nor do we question the Court of Appeals' concern that physicians retained by benefits plans may have an 'incentive to make a finding of not disabled' in order to save their employers money and to preserve their own consulting arrangements."

88. The biased, selective, cherry-picked and unfavorable reviews of Plaintiff's long-term disability claim by Drs. Hoenig, Janapana, Farache and Nudell, are a ***direct result*** of their conflicts of interest as referenced herein, and their desire to protect their consulting arrangements and business relationships with MLS, MES Solutions, Liberty Mutual and the disability insurance industry.

89. In a letter dated November 30, 2018, Liberty Mutual provided Plaintiff with the medical records only "paper reviews" authored by Drs. Farache and Nudell and requested for Plaintiff to "review and comment" on the reports if she desired.

90. In a twelve (12) page letter dated January 14, 2019, Plaintiff responded to Liberty Mutual's November 30, 2018 letter as well as Drs. Farache and Nudell's reports, by addressing the many inaccuracies which formed the basis of their opinions, and she

reiterated all of the points and issues she previously conveyed to Liberty Mutual for why she was unable to work. Plaintiff also again informed Liberty Mutual why her long-term disability claim and her allegations were supported by the opinions of her treating, evaluating medical and other professionals' opinions.

91. In Drs. Farache and Nudell's November 14, 2018 medical records only "paper reviews" provided to Plaintiff on November 30, 2018, they document telephone conversations between themselves and the independent board certified neurological medical examiner/physician who personally examined Plaintiff and authored an Independent Medical Examination report dated June 28, 2018, where he opined she was totally disabled as referenced *supra*.

92. In Plaintiff's January 14, 2019 letter, she requested for Liberty Mutual to engage in a dialogue with her by providing the written summaries of the conversations between Drs. Farache and Nudell and the independent neurological medical examiner/physician who examined Plaintiff, so he could respond to the many inaccuracies and biased opinions Plaintiff anticipated Drs. Farache and Nudell would set forth in their written summaries.

93. On February 27, 2019, Plaintiff submitted to Liberty Mutual a February 22, 2019 written summary authored by Plaintiff's independent neurological medical examiner/physician, who summarized his conversation with Dr. Nudell. The independent neurological examiner/physician also addressed the inaccuracies (and provided clarifications) to Dr. Nudell's written summary of their telephone conversation.

94. The independent neurological medical examiner/physician confirmed in his February 22, 2019 written summary that he informed Dr. Nudell during their conversation, "based upon my review of the medical records as well as the in-person examination completed with regard to [Plaintiff] on 06/28/2018, that it was my opinion that she was not capable of working in any capacity beginning as of June of 2017…" and he found Plaintiff

to be, "credible and her history to be consistent with that documented in the medical records."

95. On March 11, 2019, Plaintiff submitted to Liberty Mutual a February 21, 2019 written summary authored by the same independent neurological medical examiner/physician who summarized his conversation with Dr. Farache.

96. The independent neurological medical examiner/physician confirmed in his February 21, 2019 written summary the following, "…I stressed to Dr. Farache that I thought [Plaintiff's] overall clinical history as well as in-person examination were congruent and consistent with an individual who was unable to work…"

97. In a letter dated April 10, 2019, Liberty Mutual informed Plaintiff it was denying her claim for long-term disability benefits because, "…our position remains that proof of her disability in accordance with the [Policy] provisions has not been provided…"

98. Liberty Mutual also informed Plaintiff in its April 10, 2019 denial letter that, "As a result of Dr. Nudell and Dr. Farache not reaching consensus with Dr. Kahn, we referred [Plaintiff's] file for an additional neurology review."

99. As of the date of filing this Complaint, Plaintiff has not been provided a copy of the report allegedly authored by a neurologist Liberty Mutual retained to review her disability claim.

100. Upon information and belief, Plaintiff alleges the neurologist allegedly retained by Liberty Mutual retained to review her disability claim, like every aforementioned doctor who was retained to review Plaintiff's claim, is also a biased, long-time medical consultant for Liberty Mutual and/or the disability insurance industry.

101. Upon information and belief, similar to Liberty Mutual's retained doctors referenced *supra*, due to his/her long-time relationship with Liberty Mutual and/or the disability insurance industry, this medical records "paper reviewing" neurologist has a conflict of interest and an incentive to protect his/her own consulting relationships with

Liberty Mutual and/or the disability insurance industry by providing medical records only "paper reviews" which selectively review, de-emphasize and ignore evidence, so he/she can provide opinions and report(s) which are favorable to insurance companies such as Liberty Mutual and allow it to deny a claim.

102. Prior to rendering its April 10, 2019 final denial in Plaintiff's claim, Liberty Mutual unlawfully never shared with Plaintiff or her treating and/or examining medical professionals (who had all examined/evaluated her personally and opined she was disabled and unable to work), the medical records only "paper review" report authored by its medical records reviewing neurologist, so Plaintiff and her medical professionals could respond to the report by addressing the issues and/or deficiencies he/she and Liberty Mutual alleged existed in Plaintiff's claim and which in part, formed the basis and rationale for the denial of her claim.

103. Due to Liberty Mutual's ERISA procedural irregularity and error by not providing Plaintiff and her treating and/or evaluating medical professionals with its medical records reviewing neurologist's report before issuing its final denial, ERISA and Ninth Circuit law now allow Plaintiff to respond to the report by supplementing the administrative record with responses from herself and her medical and other professionals in litigation.

104. Due to Liberty Mutual's blatant ERISA procedural violation, its failure to engage in dialogue with Plaintiff, and failure to provide a "full and fair" review, Plaintiff, her medical and other professionals must be afforded with an opportunity to review Liberty Mutual's neurologist's report and to respond to it so she can perfect her claim. *Abatie v. Alta Health & Life Ins. Co.* 458 F.3d at 973 (9th Cir. 2006) allows this Court to take "additional evidence when the irregularities have prevented full development of the administrative record. In that way the court may, in essence, recreate what the administrative record would have been had the procedure been correct."

105. Liberty Mutual's failure to engage Plaintiff in a dialogue by not providing Plaintiff and her treating and/or evaluating medical professionals with its medical records reviewing neurologist's report (when it previously did and knew Plaintiff's medical professionals wanted the opportunity to respond to it) before issuing its final denial was unreasonable, unlawful and evidence that its structural, financial conflict of interest as referenced *supra*, influenced Liberty Mutual's decision leading it to deny the claim after not providing the "full and fair" review required by ERISA.

106. Liberty Mutual's action in not providing Plaintiff with a copy of its medical records reviewing neurologist's report before it denied her claim so she and her treating and/or evaluating medical professionals could respond to it, is not the action that a similarly situated *un-conflicted* fiduciary would have engaged in under the same circumstances.

107. Liberty Mutual's failure to provide its medical records reviewing neurologist's report to Plaintiff so she, her medical and other professionals could respond as necessary, precluded not only a "full and fair" review pursuant to 29 C.F.R. § 2560.503-1, but also precluded Liberty Mutual and this Court with a better and clearer understanding of Plaintiff's disabling medical conditions and work limitations.

108. An *un-conflicted* fiduciary administering the claim in Plaintiff's best interests would have complied with Ninth Circuit law by engaging her in a dialogue whereby it disclosed its medical records reviewing neurologist's report with Plaintiff and her medical and other professionals at a time when it mattered, ***before*** Liberty Mutual rendered a final denial in her claim.

109. Liberty Mutual had a duty pursuant to ERISA and Ninth Circuit law to engage Plaintiff in a dialogue and to allow her to participate in Liberty Mutual's review process so she had an opportunity to perfect her claim and to cure any deficiencies Liberty Mutual believed existed in her claim, ***before*** it rendered a final denial in her claim.

110. Liberty Mutual's failure to provide its medical records reviewing neurologist's report to Plaintiff and her treating, evaluating medical and other professionals is an ERISA procedural error because it precluded Plaintiff from perfecting her claim. Liberty Mutual's failure to provide its neurologist reports prevented the Plaintiff from curing any defects it alleged existed in her claim, defects which formed the basis and rationale for Liberty Mutual's denial.

111. Liberty Mutual's failure to engage Plaintiff in a dialogue during its review of her claim is one of many reasons why Liberty Mutual unlawfully, unreasonably and implausibly denied Plaintiff's claim for long-term disability benefits.

112. The basis and rationale forming the basis of Liberty Mutual's April 10, 2019 final denial in Plaintiff's claim confirms those deficiencies were not inconsequential *to Liberty Mutual*, they formed the reason, basis and rationale for why it denied her claim.

113. Liberty Mutual's action in not providing the medical records reviewing neurologist's report to her or her treating/evaluating medical professionals violated ERISA and Ninth Circuit case law as held in *Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 680 (9th Cir. 2011):

> "The plan evidently based its denial in large part on review of Salomaa's file by two physicians, one for the first denial, ***another for the final denial***. They both wrote their appraisals for the plan administrator. Yet the plan failed to furnish their letters to Salomaa or his lawyer. The regulation, quoted above, requires an ERISA plan to furnish 'all documents, records, and other information relevant for benefits to the claimant.' ***A physician's evaluation provided to the plan administrator falls squarely within this disclosure requirement.*****"** (emphasis added).

114. In Liberty Mutual's final denial dated April 10, 2019, notwithstanding Plaintiff's credible and reliable evidence which clearly proved she met and continues to meet the "Own Occupation" definition of disability in the Policy, and that her medical conditions had not improved in any way since she initially became disabled on July 25, 2017, it notified Plaintiff it made a final denial in her long-term disability claim.

115. In its final denial dated April 10, 2019, Liberty Mutual notified Plaintiff she has exhausted her administrative levels of review and that can file a civil action lawsuit in federal court pursuant to ERISA.

116. Liberty Mutual's April 10, 2019 final denial letter is clear evidence that it breached its fiduciary duty to Plaintiff by failing to provide a "full and fair review," as required by ERISA. *See* 29 C.F.R. § 2560.503-1.

117. During its review, Liberty Mutual due to its conflict of interest, self-interest and bias, intentionally and negligently committed numerous ERISA procedural irregularities/violations as identified herein which paved the way for and allowed Liberty Mutual to deny the Plaintiff's claim, even though ERISA's regulations were enacted to protect employee/beneficiary's rights such as the Plaintiff's.

118. Liberty Mutual's ERISA violations include but are not limited to, completely failing to credit, reference, consider, and/or selectively reviewing and de-emphasizing most, if not all of Plaintiff's credible and reliable evidence which proved she met the "Own Occupation" definition of disability in the Policy.

119. In evaluating Plaintiff's claim on appeal, Liberty Mutual owed her an ERISA fiduciary duty pursuant to 29 U.S.C. § 1104, and had an obligation pursuant to ERISA to administer the claim, "solely in [her] best interests and other participants."

120. Liberty Mutual's structural financial conflict of interest as the decision-maker and payor of benefits influenced and ***directly*** led to the decision to deny Plaintiff's claim and precluded it from administering Plaintiff's claim in her best interests. [1]

[1] It sets forth a special standard of care upon a plan administrator, namely, that the administrator "discharge [its] duties" in respect to discretionary claims processing "solely in the interests of the participants and beneficiaries" of the plan, § 1104(a)(1); it simultaneously underscores the particular importance of accurate claims processing by insisting that administrators "provide a 'full and fair review' of claim denials," Firestone, 489 U.S., at 113, 109 S. Ct. 948, 103 L. Ed. 2d 80 (quoting § 1133(2)); and it supplements marketplace and regulatory controls with judicial review of individual claim

121. Due to its aforementioned conflicts of interest, Liberty Mutual administered Plaintiff's claim *solely in Liberty Mutual's best interests* and not in Plaintiff's best interests.

122. Liberty Mutual failed to adequately investigate the claim, and failed to engage Plaintiff in a dialogue during the appeal of her claim regarding what evidence was necessary so Plaintiff could perfect her claim/appeal allowing it to be approved, rather than denied.

123. Liberty Mutual's failure to investigate the claim and to engage Plaintiff in this dialogue, and failure to ask for and/or obtain the evidence it believed was necessary and critical to cure any deficiencies in Plaintiff's claim so it could be approved is particularly egregious given the nature and severity of Plaintiff's disabling medical conditions.

124. Plaintiff asserts Liberty Mutual's review was neither "full nor fair" because it violated ERISA, specifically, 29 U.S.C. § 2560.503-1, for many reasons including, but not limited to: failing to credit Plaintiff's credible, reliable evidence; by failing to retain truly independent third party vendors to be involved in the review of Plaintiff's medical records and her claim; by failing to have Plaintiff's claim reviewed by truly independent medical professionals; by abdicating its ERISA fiduciary duty and retaining biased companies such as MLS and MES Solutions to be involved in the review of Plaintiff's claim; by abdicating its fiduciary duty and allowing MLS and MES Solutions to retain biased doctors such as Drs. Hoenig, Janapana, Farache, Nudell and the undisclosed reviewing neurologist to be involved in the review of Plaintiff's claim, and then relying on their biased opinions to deny the claim; by failing to fully, properly and adequately investigate Plaintiff's claim; by failing to obtain an Independent Medical Examination or a Functional Capacity Evaluation to evaluate Plaintiff's functional abilities when the Policy allowed for them and Plaintiff's disabling medical conditions, her subjective disabling complaints, and work limitations

---

denials, see § 1132(a)(1)(B). *Metro. Life Ins. Co. v. Glenn*, 128 S. Ct. 2343, 2350 (U.S. 2008).

could not be adequately evaluated/understood by reviewing ***only*** her medical records (this action raises legitimate questions about the thoroughness and accuracy of Liberty Mutual's denial of the claim); by providing biased and one sided reviews of Plaintiff's claim which failed to consider/evaluate/weigh all the evidence Liberty Mutual obtained in Plaintiff's claim and which was also submitted by Plaintiff; by de-emphasizing medical and other evidence which supported Plaintiff's claim and the approval of her claim; by emphasizing only Liberty Mutual's evidence which supported the denial of Plaintiff's claim; by disregarding, failing to consider/weigh and minimizing Plaintiff's disabling subjective and self-reported complaints/symptoms/limitations; by failing to consider the combined effect that all of Plaintiff's medical conditions, subjective complaints and resulting limitations documented in her medical, vocational and lay-witness evidence had on her ability to work in her "Own Occupation;" by failing to engage Plaintiff in a dialogue and to disclose to Plaintiff and her treating and/or evaluating medical professionals Liberty Mutual's medical records reviewing neurologist's report so she and they could respond by submitting the evidence Liberty Mutual believed/alleged was necessary so she could perfect her claim and prove she is disabled from working in her "Own Occupation" as that term is defined in the Policy; and by failing to properly consider the significant, adverse impact and negative affect the side effects Plaintiff's medications have on her ability to engage in her "Own Occupation" as that term is defined in Liberty Mutual's Policy.

125. Plaintiff alleges Liberty Mutual's structural financial conflict of interest, created by its dual roles as the decision maker and the payor of benefits, was the reason it engaged in an unlawful review where it abdicated its ERISA fiduciary duty set forth at 29 U.S.C. § 1104, and provided a review that was neither "full nor fair" pursuant to ERISA's regulations, specifically 29 U.S.C. § 2560.503-1,

126. Liberty Mutual's conflict of interest provided it with a financial incentive to deny Plaintiff's long-term disability claim, because the sizable financial amount Liberty Mutual deliberately failed to pay Plaintiff now represents a profit for Liberty Mutual.

127. Liberty Mutual's actions are similar to the conflicted and unlawful review provided by another insurance company where the Ninth Circuit held:

> "The plan with a conflict of interests also has a financial incentive to cheat. Failing to payout money owed based on a false statement of reasons for denying is cheating, every bit as much as making a false claim."
>
> *See Salomaa v. Honda Long Term Disability Plan*, 637 F.3d 958, 970 (9th Cir. 2011).

128. Plaintiff is entitled to discovery regarding Liberty Mutual's aforementioned conflicts of interest, its bias and business relationships referenced herein, as well as the conflicts of interest of any third party vendor (including but not limited to MLS and MES Solutions) hired by Liberty Mutual, and any medical professional (including but not limited to the medical records reviewing non-disclosed neurologist and Drs. Hoenig, Janapana, Farache and Nudell) retained by Liberty Mutual to review Plaintiff's claim, and of *any* individual, medical professional or otherwise, who reviewed any evidence and/or participated in the review of her claim.

129. Ninth Circuit law allows discovery so the Court can properly weigh and consider the nature, extent and effect that *any* conflict of interest and/or any ERISA procedural violation had in influencing and resulting in Liberty Mutual's decision to deny Plaintiff's long-term disability claim.

130. Plaintiff has the burden to produce evidence regarding the various conflicts of interest of Liberty Mutual and of any other entity or individual who was retained by Liberty Mutual to be involved in the review of her claim as referenced herein, so the Court can consider the weight to give those conflicts in its review of Liberty Mutual's denial of her claim.

131. Liberty Mutual's third-party vendors, MLS and MES Solutions, and their reviewing medical professionals' conflicts of interest as referenced herein, tainted their opinions which resulted in the biased, adverse opinions they rendered against Plaintiff and which allowed Liberty Mutual to unreasonably deny her claim.

## ***I. Count I - Claim for Long-Term Disability Benefits***

132. All previous paragraphs are incorporated by reference as though fully set forth herein.

133. The Policy promises that Plaintiff is entitled to a portion of her pre-disability earnings at a certain amount if she meets the Policy's "Own Occupation" definition of disability during the Elimination Period and the next twenty-four (24) months of benefits.

134. Plaintiff has submitted reliable, credible and compelling evidence to prove she met and continues to meet the "Own Occupation" definition of disability set forth in the Policy.

135. Liberty Mutual's group long-term disability insurance Policy No. GF3-850-289424-01, confirms its "Governing Jurisdiction is Minnesota and subject to the laws of that State."

136. Liberty Mutual's group long-term disability insurance Policy No. GF3-850-289424-01, confirms that beginning on January 1, 2011, it has been renewed annually – each January 1st. Therefore, Policy No. GF3-850-289424-01 has been renewed nine (9) consecutive years with the Minnesota Department of Insurance.

137. As of January 1, 2016, Minnesota law, specifically Minn. Stat. § 62Q.107, invalidates and bars any clause from being contained in a disability income policy which contains a provision which specifies a standard of judicial review, or which delegates the sole discretion to decide ERISA benefit claims to an insurance company.

138. Minnesota law, specifically Minn. Stat. § 62Q.107, applies to disability policies which are renewed after January 1, 2016, the date the statute was enacted.

139. Because Liberty Mutual's Policy is governed by Minnesota law, and Liberty Mutual has renewed the Policy after the date Minn. Stat. § 62Q.107 was enacted, any language in Liberty Mutual's Policy which purports to grant discretion to Liberty Mutual is voided, unlawful and unenforceable pursuant to Minnesota law.

140. Pursuant to Minn. Stat. § 62Q.107, the Court will make a *de novo* determination in this case regarding whether Plaintiff meets the "Own Occupation" definition of disability and is entitled to long-term disability benefits.

141. In denying Plaintiff's claim, Liberty Mutual failed to provide a "full and fair" review pursuant to ERISA, and its denial of her long-term disability claim is a *de novo* wrong decision, because her evidence proves she met and continues to meet the "Own Occupation" definition of disability in the Policy.

142. Notwithstanding Minnesota law, if the Court concludes the Policy confers discretion and the standard of review is for an abuse of discretion, Plaintiff asserts that Liberty Mutual's unlawful decision which resulted from its financial conflict of interest and numerous unlawful ERISA violations as referenced herein, constitutes an abuse of discretion.

143. As a direct result of Liberty Mutual's decision to deny Plaintiff's disability claim and benefits, she has been injured and suffered damages in the form of lost long-term disability benefits pursuant to the Policy, in addition to other potential non-disability employee benefits she may be entitled to receive through or from the Plan, from any other Company Plan and/or the Company as a result of being found disabled in this matter.

144. Upon information and belief, Plaintiff alleges other potential non-disability employee benefits may include but not be limited to, health insurance benefits and coverage, and other insurance related coverage or benefits, retirement benefits or a pension, life insurance coverage and a waiver of the premium due on a life insurance policy which may provide coverage for her and her family/dependents.

145. Pursuant to 29 U.S.C. § 1132, Plaintiff is entitled to recover unpaid disability and non-disability employee benefits, prejudgment interest, reasonable attorney's fees and costs from Defendant.

146. Plaintiff seeks any and all employee benefits, including but not limited to disability benefits and any other benefit she may be entitled to and which are due from the Defendant as a result of being found disabled in this matter.

### ***II. <u>Count II - Claim for Equitable Relief Arising From Liberty Mutual's Breach of Its Fiduciary Duties under ERISA 29 U.S.C. § 1132(a)(3)</u>***

147. All previous paragraphs are incorporated by reference as though fully set forth herein.

148. Upon information and belief, when Liberty Mutual receives an insured's claim for disability benefits, it must set aside claim reserves to cover its potential future liability.

149. Upon information and belief, Liberty Mutual's setting aside substantial amounts of claim reserves negatively impacts its profitability.

150. Upon information and belief, when Liberty Mutual terminates or denies an insured's claim for long-term disability benefits, it recovers the reserves it had set aside and returns the recovered reserves to the company's general assets.

151. Upon information and belief, when Liberty Mutual terminates or denies an insured's claim for long-term disability benefits and recovers the reserves it had set aside to cover its potential future claim liability, Liberty Mutual shows increased profitability versus when the claim reserves were required to be set aside to cover potential future claim liability.

152. Upon information and belief, when Plaintiff made her claim for disability benefits, Liberty Mutual set aside a certain amount of money as reserves to cover potential future claim liability it may have in her claim.

153. Upon information and belief, Liberty Mutual informed some or all of the employees involved in Plaintiff's claim about its need to set aside reserves when it receives a disability claim, and/or about the reserves it set aside to cover the potential future claim liability regarding Plaintiff's disability claim.

154. Upon information and belief, the Liberty Mutual employees involved in Plaintiff's claim understand that the company's ability to release or recover claim reserves upon a claim being denied or benefits being terminated increases the company's profitability.

155. Upon information and belief, when Plaintiff's claim for long-term disability benefits was denied, Liberty Mutual released the reserves it had set aside to cover potential future liability on her claim to the company's general assets.

156. Upon information and belief, when Plaintiff's claim was denied, Liberty Mutual was able to show increased profitability for the relevant financial accounting and/or reporting period or periods.

157. Upon information and belief, Liberty Mutual has an employee incentive compensation and/or bonus program.

158. Upon information and belief, additional compensation paid to employees under Liberty Mutual's employee incentive compensation and/or bonus compensation program is determined in part by Liberty Mutual's profitability.

159. Upon information and belief, Liberty Mutual employees, including the employees involved in Plaintiff's claim and her appeal(s), understand that by denying claims, terminating benefits, and/or delaying the payment of claims, Liberty Mutual may show increased profitability; and they further understand this increased profitability may translate to increased employee incentive compensation or bonus compensation for themselves.

160. Upon information and belief, Liberty Mutual earns substantial interest and/or a return on equity on its holdings, including its cash holdings.

161. According to Liberty Mutual's financial statements, the company showed a 12.1% Return On Equity (ROE) in its group benefits business segment for the twelve months ending September 30, 2017. *See e.g.* https://www.libertymutualgroup.com/about-lm/investor-relations/financial-reports#Year=2019.

162. Upon information and belief, Liberty Mutual has a corporate policy, pattern, and/or practice of not paying insureds interest on benefits that are retroactively paid or reinstated following an appeal, or otherwise does not compensate insureds for the use of their unpaid benefits while their claims are denied and unpaid.

163. Liberty Mutual is a fiduciary under ERISA.

164. As a fiduciary under ERISA, Liberty Mutual may not put its interests ahead of the interests of its insureds.

165. Under ERISA, Liberty Mutual may be liable for its breaches of its fiduciary obligations to Plaintiff separately and distinct from its liability for unpaid disability benefits.

166. In *CIGNA Corp. v. Amara*, 563 U.S. 421, 444, 131 S. Ct. 1866, 1881-82, 179 L. Ed. 2d 843 (2011), the Supreme Court endorsed one form of equitable relief — a surcharge against the administrator — which is available upon a showing that the administrator breached its fiduciary duties and the breach harmed the participant: "To be sure, just as a court of equity would not surcharge a trustee for a nonexistent harm, 4 Scott & Ascher § 24.9, a fiduciary can be surcharged under § 502(a)(3) [i.e. 29 U.S.C. § 1132(a)(3)] only upon a showing of actual harm—proved (under the default rule for civil cases) by a preponderance of the evidence…"

167. Additional equitable remedies available under 29 U.S.C. § 1132(a)(3) and *Amara*, 563 U.S. at 440, include but are not limited to: equitable reformation of an

ERISA plan and restitution to remedy harm caused by an administrator's breach of its fiduciary obligations.

168. As a result of Liberty Mutual's placing its interests ahead of the interests of Plaintiff and breaching its fiduciary duties to Plaintiff, Plaintiff has been damaged in a manner separate and distinct from Liberty Mutual's denial of her benefits and separate and distinct from her claim for benefits under 29 U.S.C. § 1132(a)(1).

169. Among other damages and losses, Liberty Mutual's placing its interests ahead of Plaintiff's interests has caused Plaintiff financial harm and distress including her having to take out three (3) loans against her 401(k) account, her having to pay income taxes and potentially penalties on the amounts of the 401(k) loans, and the loss of market return on the 401(k) monies Plaintiff was forced to withdraw from her account due to Liberty Mutual's improper denial of her benefits.

170. Due to Liberty Mutual's breach of its fiduciary duty to her, she has suffered emotional distress and complications to her severe medical conditions as a result of and in connection with Liberty Mutual's improper denial of her long-term disability benefits.

171. Under 29 U.S.C. § 1132(a)(3) and *Amara*, Plaintiff is entitled to equitable relief for the separate and distinct harm she suffered as a result of Liberty Mutual's breach of its fiduciary obligations.

172. Under 29 U.S.C. § 1132(a)(3) and *Amara*, and due to Liberty Mutual's breach of its fiduciary obligations to Plaintiff, Plaintiff is entitled to equitable relief which includes, but is not limited to: a *surcharge* against Liberty Mutual in the amount of the financial harm Plaintiff suffered in excess of the value of her unpaid disability benefits and any interest paid upon the approval and payment of her disability benefits; *restitution* against Liberty Mutual in the amount of the financial harm Plaintiff suffered in excess of the value of her lost disability benefits and any interest paid upon the approval and payment of her disability benefits; *equitable reformation* of the Plan to permit Plaintiff to

recover damages in the amount of the financial harm she suffered in excess of the value of her lost disability benefits and any interest paid upon the approval and payment of her disability benefits; *equitable reformation* of the Plan to permit Plaintiff to recover any interest or return on equity which Liberty Mutual earned due to its breaches of its fiduciary obligations to Plaintiff; and any other equitable damages or relief to which Plaintiff may be entitled.

173. Pursuant to *Amara* and other law, Plaintiff need only prove her claim for equitable relief under 29 U.S.C. § 1132(a)(3) by a preponderance of the evidence.

174. Pursuant to *Amara* and other law, to prevail on her claim for equitable relief under 29 U.S.C. § 1132(a)(3), Plaintiff need only prove by a preponderance of the evidence that Liberty Mutual caused her harm.

175. Pursuant to *Amara* and other law, Plaintiff need only prove by a preponderance of the evidence the damages Liberty Mutual caused her to experience in order to prevail on her claim for equitable relief under 29 U.S.C. § 1132(a)(3).

176. With respect to Plaintiff's claims for equitable relief under 29 U.S.C. § 1132(a)(3) and *Amara*, Plaintiff is entitled to discovery in order to prove Liberty Mutual's violations of its fiduciary obligations to Plaintiff, and to prove that Liberty Mutual's violations of its fiduciary obligations to Plaintiff are consistent with a corporate pattern and practice designed to elevate the company's interests over the interests of its insureds.

177. With respect to Plaintiff's claims for equitable relief under 29 U.S.C. § 1132(a)(3) and *Amara*, Plaintiff is entitled to *de novo* review as to Liberty Mutual's violations of its fiduciary obligations.

178. With respect to Plaintiff's claims for equitable relief under 29 U.S.C. § 1132(a)(3) and *Amara*, Plaintiff is entitled to a bench trial as to Liberty Mutual's violations of its fiduciary obligations.

179. Pursuant to 29 U.S.C. § 1132(g), Plaintiff is entitled to recover attorney's fees and costs from Defendant in her claim brought for equitable relief under 29 U.S.C. § 1132(a)(3).

WHEREFORE, Plaintiff prays for judgment as follows:

A. For an Order finding the evidence in Plaintiff's claim is sufficient to prove that she met and continues to meet the "Own Occupation" definition of disability set forth in the relevant Plan and/or Policy, and she is entitled to long-term disability benefits, and any other non-disability employee benefits as a result of that Order, from the date she was first entitled to these benefits but was denied them, through the date of judgment with prejudgment interest thereon;

B. For an Order directing Defendant to continue paying Plaintiff the aforementioned benefits until such a time as she meets the conditions for the termination of benefits;

C. In the event the Court is unable to render a decision as to whether Plaintiff is entitled to long-term disability benefits from Liberty Mutual for any reason, she seeks an Order remanding her claim and this case to Liberty Mutual so it can render a determination consistent with the Order issued by the Court;

D. For an Order finding the evidence in Plaintiff's claim is sufficient to prove Liberty Mutual breached its fiduciary obligations when it improperly denied her claim for long-term disability benefits, and that she is entitled to equitable relief and damages in an amount sufficient to compensate her for her separate and distinct harm and losses, from the date she was first entitled to long-term disability benefits from Liberty Mutual but was denied them, through the date of judgment with prejudgment interest thereon;

E. For an Order directing Defendant to provide Plaintiff with the equitable relief and damages she is due and seeks under Count II of Plaintiff's Complaint;

F. For attorney's fees and costs incurred as a result of prosecuting this suit pursuant to 29 U.S.C. §1132(g); and

G. For such other and further relief as the Court deems just and proper.

DATED this 13th day of August, 2019.

SCOTT E. DAVIS. P.C.

By: *<u>/s/ Scott E. Davis</u>*
Scott E. Davis
Attorney for Plaintiff